SINVA, INC., Plaintiff,

v.

MERRILL, LYNCH, PIERCE, FENNER & SMITH, INCORPORATED, Defendants.

No. 65 Civ. 1566.

United States District Court
S. D. New York.

April 12, 1966.

Jackson, Nash, Brophy, Barringer &
Brooks, New York City, for plaintiff;
Lawrence P. McGauley, John G. Lipsett,
New York City, of counsel.

Brown, Wood, Fuller, Caldwell & Ivey, New York City, for defendant; Richard Conway Casey, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge:

In this action against a broker for damages arising out of alleged unauthorized transactions in sugar futures contracts for plaintiff's commodity account defendant has moved (1) under 9 U.S.C. § 3 to stay the action pending arbitration; (2) under Rule 12(f), F.R. Civ.P., to strike as immaterial the allegations of the third claim in the amended complaint charging violations of the Securities Act of 1933, and the Securities Exchange Act of 1934. 15 U.S.C. §§ 77a, 78a.

Plaintiff Sinva, Inc. (Sinva) is a Panamanian corporation having its principal place of business in Berne, Switzerland. It has no office in the United States. Sinva is engaged primarily in financing and investment in various projects in Italy. Pasquale Paolo Sepe, an Italian national, is its sole shareholder and managing agent. Defendant Merrill, Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch) is a Delaware corporation engaged in the brokerage and investment business with offices in major cities in this country and abroad. Its principal place of business is in New York.

Apart from the Federal Arbitration Act and other federal question claims asserted here, there is diversity jurisdiction in this case. 28 U.S.C. § 1332(a) (2).

In 1961 Sinva, acting through its agent Sepe, opened a commodity account with Merrill Lynch's Paris office. At all relevant times plaintiff has also maintained a securities account with the defendant's New York office. The amended complaint alleges three claims for relief arising out of transactions relating to these accounts.

First, it is alleged that on May 21, 1963, plaintiff had a position of 45 sugar futures contracts in its commodity account in Paris; that thereafter defendant purchased 77 additional contracts for the plaintiff's account and sold 5 others, all in contravention of plaintiff's express instructions; and that defendant refused to cancel these transactions despite plaintiff's disavowal. It is further alleged that defendant failed to make timely execution of plaintiff's instructions to sell its original position of 45 contracts.

The second claim repeats the prior allegations and further avers that the defendant has kept for itself the proceeds from the sale of the 45 contracts, together with the cash balance in plaintiff's commodity account at the date of the commencement of the unauthorized transactions. It is also alleged that the defendant converted $58,041.25 from plaintiff's New York security account, presumably to offset a deficiency in the Paris account resulting from losses sustained in the sugar futures commodity transactions.

The third claim, against which defendant's motion to strike is directed, alleges sundry violations of the Securities Act of 1933 and the Securities Exchange Act of 1934. Defendant's conduct, as described in the prior allegations, is said to constitute a breach of fiduciary duty by a broker dealer towards its customer. It is further averred that this breach of duty, with the attendant conversion of plaintiff's property, amounted to a course of business which operated as a fraud on plaintiff in connection with the purchase or sale of securities. Plaintiff seeks damages of $196,621.46.

Defendant has moved to stay the action pending arbitration and to strike as immaterial the allegations charging violations of the federal securities acts.

1. *The Motion for a Stay.*

Under the Federal Arbitration Act this court is empowered to "stay the trial of the action until * * * arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. In support of its motion for a stay under this section defendant places primary reliance upon the so-called "General Agreement" admittedly entered into by the parties here. By its terms this contract extends to all "securities and commodi-

ties" accounts the customer maintains with Merrill Lynch.[1] It incorporates the "rules and regulations"—presumably including the arbitration requirements—of the Exchange where the transactions were executed.

Furthermore, the parties agree that each of the sugar futures contracts here involved was executed on the standard London Raw Sugar Terminal Contract No. 2. Each of those contracts in turn "is subject to the Rules and Regulations of the United Terminal Sugar Market Association (the Association)." And, as the final step in defendant's argument, those rules contain an arbitration clause upon which the motion for a stay is premised.[2]

Plaintiff contends in essence that the parties have never entered into any agreement to arbitrate and more particularly an agreement to arbitrate the questions posed in this case. It urges that unauthorized acts of an agent could not have the effect of binding plaintiff as a party to an agreement on a London Raw Sugar Terminal Contract No. 2 form. For this reason it is argued that plaintiff never

became bound to arbitrate under the rules of the Association with respect to these unauthorized transactions.[3]

Viewed in these terms, the issue is whether the parties ever executed an agreement to arbitrate, and if so, whether that agreement encompasses the dispute which is the basis of the lawsuit; or more narrowly, whether a controversy over the authority of an agent entering into a contract on behalf of a principal constitutes a "question or dispute arising under [the] Contract" within the meaning of the operative terms of the arbitration clause.

■ The parties have raised a threshold question on this motion as to whether federal law or New York law is applicable. The defendant recognizes that in order to qualify for the requested stay under federal law the contract in which the arbitration clause is contained must be one "evidencing a transaction involving commerce." 9 U.S.C. § 2; see Metro Indust. Painting Corp. v. Terminal Constr. Co., 287 F.2d 382, 384 (2 Cir.), cert. den., 368 U.S. 817, 82 S.Ct. 31, 7 L.Ed.2d 24 (1961). "Commerce" is de-

---

1. The agreement provides in pertinent part:
 "In consideration of your acting as broker for the undersigned, I hereby consent and agree that:
 "Any *transaction shall be subject* to the constitution, *rules*, regulations, customs and usages *of the exchange* or market (and its clearing house, if any), *where executed.*
 "Any and all *securities or commodities*, or contracts relating thereto, now or hereafter held or carried by you *in any of my accounts* (either individually or jointly with others), are to be held by you as security of any liability to you in any of said accounts, with the right on your part to transfer moneys or securities from any one of my accounts to another when in your judgment such transfer may be necessary; and all such *securities and commodities* may, from time to time, and without notice, be pledged and repledged by you, either separately or in common with other *securities or commodities*, for any amount due upon my account(s), or for any greater amount, without retaining in your possession or control for delivery a like amount of similar *securi-*

 *ties or commodities.*" (Emphasis added.)

2. This clause reads as follows:
 "In the event of *any question or dispute arising under a Contract* made on these Rules and through the intermediary of a Full Member of the Association, the matter must be referred to arbitration to the Committee whose decision shall be final. In all other cases the Committee reserve to themselves the right of refusing to arbitrate. The decision of the majority attending shall prevail and in the event of an equality of votes the Chairman, who shall have been previously elected by the members so attending, shall have a second or casting vote." (Emphasis added.)
 Merrill Lynch has acted through the "intermediary of a Full Member of the Association" with respect to each of the contracts transacted for plaintiff's commodity account.

3. Similarly, an unauthorized "transaction" within the meaning of the General Agreement, supra note 1, could not bind plaintiff to submit such disputes to arbitration.

fined in 9 U.S.C. § 1 to embrace "commerce among the several States or with foreign nations." In limine, then, an issue arises as to whether the sugar futures contracts involved here fall within these definitions.[4]

The form No. 2 contract on its face certainly evidences no agreement involving the foreign commerce of the United States. It simply states that an "undetermined number of lots of 50 tons each" were purchased or sold for the client's (Sinva's) account. And the facts developed in the papers submitted on these motions do not establish that the sugar futures are "contract[s] evidencing a transaction involving commerce." The agreements, whether authorized or not, were entered into in the name of an Italian citizen, who was the sole stockholder of a Panamanian corporation having its principal office in Switzerland, at the Paris office of the defendant, a Delaware corporation. The contracts called for the purchase and sale of sugar for future delivery on the London Commodities Exchange.

The only connection with the foreign commerce of this country is that the party who entered into these contracts on plaintiff's behalf is a United States corporation.[5] Compare Robinson v. Bache & Co., 227 F.Supp. 456 (S.D.N.Y.1964). No transaction involving the foreign commerce of the United States was anticipated. See Metro Indust. Painting Corp. v. Terminal Constr. Co., supra, 287 F.2d at 387 (Lumbard, C. J., concurring). None resulted. See Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 192, 6 L.Ed. 23 (1824); John W. Johnson, Inc. v. 2500 Wisconsin Ave., Inc., 98 U.S.App.D.C. 8,

231 F.2d 761 (1956). Certainly if an American citizen, acting as an agent for an Italian national, entered into an agreement with an Englishman to construct a house-in London, an arbitration clause in that agreement would not sweep the contract within the ambit of the Federal Arbitration Act. Even assuming Congress had the constitutional power to regulate the sugar futures contracts involved in the case at bar, it is plain that it had no intention to do so under § 2 of the Act.

Rejection of the asserted jurisdictional basis under the Federal Arbitration Act, however, has no significance for purposes of the ultimate disposition of this motion. This court in any event has diversity jurisdiction under 28 U.S.C. § 1332(a) (2).[6] Moreover, the Federal Arbitration Act prescribes no "mere form of procedure," but rather "touch[es] on substantive rights." Bernhardt v. Polygraphic Co., 350 U.S. 198, 202, 76 S.Ct. 273, 100 L.Ed. 199 (1956); see Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F.2d 402 (2 Cir. 1959), petition for cert. dismissed, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960). Since I have held that the sugar futures contracts do not evidence transactions involving commerce within the meaning of the substantive provisions of the Act, under Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this court will apply the law of the state from which the right to arbitration is claimed to derive. Thus New York law, including its choice-of-law rules, see Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), determines whether the dispute

4. No claim is made that the very broad General Agreement evidences a transaction "involving commerce" for purposes of § 2. For this reason I will assume—as have the parties—that the jurisdictional applicability of the Federal Arbitration Act depends upon this court's treatment of the effect of the series of agreements upon the form London Raw Sugar Terminal Contract No. 2.

5. The alleged fraudulent conversion of the balance in plaintiff's New York security account, though relevant on any jurisdictional questions involving the claims under the securities acts, does not bear upon the question of whether the sugar futures contracts evidence transactions involving commerce.

6. The fact that this court also has subject-matter jurisdiction under the securities acts, see p. 367 infra, has no bearing on the resolution of the arbitration issue.

involved in this case—the alleged unauthorized and improper action of Merrill Lynch—is referable to arbitration.

■ Despite overtones to the contrary in Auten v. Auten, 308 N.Y. 155, 124 N.E. 2d 99, 50 A.L.R.2d 246 (1954), New York for conflicts purposes treats issues concerning arbitrability as part of its "law of remedies," so that New York local law would apply in the case at bar, rather than the law of England or France which have greater contacts with the transactions involved here. Gantt v. Felipe Y Carlos Hurtado & Cia, Ltd., 297 N.Y. 433, 79 N.E.2d 815 (1918); see Metro Indust. Painting Corp. v. Terminal Constr. Co., 287 F.2d 382, 388 n. 3 (2 Cir.) (Lumbard, C. J., concurring), cert. den., 368 U.S. 817, 82 S.Ct. 31, 7 L.Ed.2d 24 (1961). Under New York law—as well as federal law if it were applicable—it is clear that defendant's motion for a stay must fail.

■ The pivotal question in this lawsuit plainly is whether Merrill Lynch, acting as Sinva's agent, had the authority to enter into the 77 sugar futures contracts on behalf of the plaintiff. If it was so authorized, Sinva is properly a party to a contract incorporating the arbitration rules of the London Exchange. On the other hand, "[i]f the agent had no authority to execute the [contracts], it likewise had no authority to bind its alleged principal to the arbitration clause." Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp., 274 F.2d 805, 809 (2 Cir. 1960).

■ Usually in arbitration cases "the initial questions before the court are whether there was a valid agreement to arbitrate and whether respondent failed,

neglected or refused to perform it." El Hoss Engineering & Transport Co. v. American Indep. Oil Co., 183 F.Supp. 394, 397 (S.D.N.Y.1960), rev'd on other grounds, 289 F.2d 346 (2 Cir. 1961); see Princeton Rayon Corp. v. Gayley Mill Corp., 309 N.Y. 13, 127 N.E.2d 729 (1955). In the case at bar determination of those questions would necessarily involve the merits of the entire controversy between the parties, concerned as it is with Merrill Lynch's authority to enter into the sugar futures contracts from which the arbitration clause stems.

But I do not reach that question here. For even if, as Merrill Lynch contends, the parties did agree to arbitrate in accordance with the rules of the London Association, the dispute as to the authority of Merrill Lynch to act on behalf of Sinva could not conceivably fall within the ambit of that agreement. That is to say, the issues in this lawsuit over the actions of Merrill Lynch as Sinva's agent under no circumstances can be deemed a "question or dispute arising under" the sugar futures contracts here involved.

■ The term "arising under" is relatively narrow as arbitration clauses go. See In re Kinoshita & Co., 287 F.2d 951 (2 Cir. 1961). By no means is it broad enough to embrace a controversy as to whether there was a meeting of minds in respect to the very contract incorporating the arbitration clause. Id. at 953.[7] Kulukundis Shipping Co., S/A v. Amtorg Trading Corp., 126 F.2d 978 (2 Cir. 1942), which involved a question of an agent's authority to contract, is squarely in point. After a careful analysis, Judge Frank concluded that "a con-

---

7. Conceptually, the allegations in the complaint that defendant was delinquent in disposing of the original 45 contracts to which plaintiff was admittedly a party pose a somewhat different problem. But even assuming that Sinva was obliged to arbitrate disputes "arising under" these contracts, it does not follow that the disagreements between Merrill Lynch and its customer are referable to arbitration under the Rules of the London Commodities Exchange. See affidavit of Lingelbach, December 22, 1965. The interpreta-

tion of the sugar futures contracts is immaterial on the question of whether they were timely disposed of pursuant to Sepe's instructions. See Old Dutch Farms, Inc. v. Milk Drivers and Dairy Employees Local Union No. 584, etc. Teamsters, 359 F.2d 598 (2 Cir., March 31, 1966). Similarly, if it were alleged that Merrill Lynch stole or converted the 45 contracts in Sinva's commodity account, no convincing case could be made that the legal issues involved were actually disputes "arising under" those contracts.

troversy relating to the denial that the parties ever made a contract is not a controversy arising out of that contract." Id. at 978; see In re Pahlberg Petition, 131 F.2d 968 (2 Cir. 1942). New York law, controlling here, is in accord with this view. See, e. g., Terminal Auxiliar Maritima, S.A. v. Winkler Credit Corp., 6 N.Y.2d 294, 298, 189 N.Y.S.2d 655, 658, 160 N.E.2d 526, 529 (1959); Matter of Wrap-Vertiser Corp. (Plotnick), 3 N.Y. 2d 17, 163 N.Y.S.2d 639, 143 N.E.2d 366 (1957); Lipman v. Haeuser Shellac Co., 289 N.Y. 76, 80, 43 N.E.2d 817, 819, 142 A.L.R. 1088 (1942); Application of Uddo, 21 A.D.2d 402, 404–406, 250 N.Y.S. 2d 645, 647–648 (1st Dep't 1964); Royal Hair Pin Corp. v. Rieser Co., 218 N.Y.S. 2d 773 (Sup.Ct.1961).

Accordingly, I conclude from an examination of the applicable instruments that the parties in this case under no circumstances intended to refer to arbitration questions concerning alleged unauthorized conduct and other improper activity committed by Sinva's broker agent. See, e. g., Strauss v. Silvercup Bakers, Inc., 353 F.2d 555 (2 Cir. 1965). Defendant's motion for a stay is therefore denied. See N.Y.C.P.L.R. § 7503.

**2.** *The Motion to Strike.*

Defendant's motion to strike under Rule 12(f) is obviously designed to test the legal sufficiency of the claim charging violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder, and § 17(a) of the Securities Act of 1933. 15 U.S.C. § 77q (a). It will be treated as the functional equivalent of a motion to dismiss the third claim. See Rule 12(b) (6), F.R. C.P.; 2 Moore, Federal Practice ¶ 12.08, at 2246–47 (2d ed. 1963).

Section 10(b) condemns manipulative or deceptive devices "in connection with the purchase or sale of any security." Similarly, § 17(a) proscribes various types of fraud or malfeasance "in the offer or sale of any securities." Plaintiff opposes the motion to strike primarily on the ground that Merrill Lynch's alleged misconduct involving the sugar futures contracts actually constituted unlawful activity with respect to "securities," or more particularly to that type of securities defined in the federal legislation as "investment contracts." 15 U.S.C. §§ 77b(1); 78c(10). Therefore, the initial question raised by the motion to strike is whether contracts to purchase sugar for future delivery are actually "investment contracts" within the meaning of the securities acts.

Plaintiff makes what is to me the novel contention that the regulatory features of the securities acts be extended into the vast domain of the commodities markets. The argument, however, though ingenious, is without basis in law. Plaintiff offers neither case authority, legislative history, nor even the speculation of commentators to justify its position. In short, nothing is proffered in support of this novel proposal to refashion the regulatory scheme prescribed by Congress; indeed, all the probative materials are to the contrary.

The phrase "investment contract," as used in the securities acts is a "nebulous term, difficult of definition and even more difficult of application." Belhumeur v. Dawson, 229 F.Supp. 78, 81 (D.Mont.1964). It is designed, of course, "to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." S. E. C. v. W. J. Howey Co., 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946).

Twice the Supreme Court has undertaken to give content and meaning to the term "investment contract." In S. E. C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), the sale of what superficially appeared to be mere leaseholds in a tract of land was held to be a sale of "investment contracts" because the seller offered economic inducements "of sharing in discovery values which might follow a current exploration enterprise." Id. at 348, 64 S.Ct. at 122. And in S. E. C. v. W. J. Howey Co., supra, an offer of plots of land in a citrus orchard was deemed to be an offer of "in-

vestment contracts" since the purchasers had been extended an opportunity to share in the profits of an enterprise managed and partly owned by the defendants. The court stated unequivocally that:

> "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise." Id., 328 U.S. at 298–299, 66 S.Ct. at 1103.

Elsewhere in the *Howey* opinion the court announced the "test" to be "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." Id. at 301, 66 S.Ct. at 1104.

The subsequent decisions have followed these guidelines. See, e. g., Roe v. United States, 287 F.2d 435 (5 Cir. 1961); Los Angeles Trust Deed & Mortgage Exchange v. S. E. C., 285 F.2d 162 (9 Cir. 1960); Blackwell v. Bentsen, 203 F.2d 690 (5 Cir. 1953), petition for cert. dismissed, 347 U.S. 925, 74 S.Ct. 528, 98 L. Ed. 1078 (1954); Darwin v. Jess Hickey Oil Corp., 153 F.Supp. 667 (M.D.Tex. 1957). And it can now fairly be said that "the line is drawn where neither the element of a common enterprise nor the element of reliance upon the efforts of others is present." 1 Loss, Securities Regulation 491 (2d ed. 1961).

▆ Under these standards, insofar as they are meaningful in the case at bar, plaintiff's contention is clearly without merit. Futures contracts generally are simply agreements for the delivery of a specified quantity of a commodity, here sugar, on any day in a given future month.[8] But the element of future delivery does not transform a commodities contract into a securities contract. The

purchaser, Sinva in this case, gained no share in a common enterprise, either between plaintiff and defendant or plaintiff and anyone else. Rather it acquired the power to exercise absolute dominion and control over the specified commodities. Sinva, if it so desired, could have accepted delivery of the sugar on the due dates.

Nevertheless, plaintiff, relying upon cases such as S. E. C. v. Crude Oil Corp., 93 F.2d 844 (7 Cir. 1937), urges that the absence of contemplation of actual delivery of the sugar purchased for its commodity account manifests an intention by the parties to deal in "investment contracts." But a failure to conclude actual delivery is the rule, rather than the exception, with regard to the future trading of commodities. See United States v. New York Coffee & Sugar Exchange, Inc., 263 U.S. 611, 616, 44 S.Ct. 225, 68 L.Ed. 475 (1924). Indeed, most traders on the futures market "usually settle their contract by a money payment representing the difference between the market price at the time of contract and the price at the time of liquidation." Note, 64 Yale L.J. 906 (1955). But as Justice Holmes has pointed out in Board of Trade of City of Chicago v. Christie Grain & Stock Co., 198 U.S. 236, 248, 249, 25 S.Ct. 637, 639, 49 L.Ed. 1031 (1905):

> "The fact that contracts are satisfied * * * by set-off and the payment of differences detracts in no degree from the good faith of the parties, and if the parties know when they make such contracts that they are very likely to have a chance to satisfy them in that way, and intend to make use of it, that fact is perfectly consistent with a serious business purpose, and an intent that the contract shall mean what it says."

> * * * * * *

> "It seems to us an extraordinary and unlikely proposition that the dealings which give its character to the great market for future sales in this country

---

**8.** See, e. g., Campbell, Trading in Futures Under the Commodity Exchange Act, 26 G.Wash.L.Rev. 215 (1957); Note, 64 Yale L.J. 906 (1955); Note, Federal Regulation of Commodity Futures Trading, 60 Yale L.J. 822 (1951).

are to be regarded as mere wagers or as 'pretended' buying or selling, without any intention of receiving and paying for the property bought, or of delivering the property sold, * * *."

Moreover, the purchase of commodities futures involves no reliance upon the efforts of promoters, managers, employees or any third party. The mere presence of a speculative motive on the part of the purchaser or seller does not evidence the existence of an "investment contract" within the meaning of the securities acts. In a sense anyone who buys or sells a horse or an automobile hopes to realize a profitable "investment." But the expected return is not contingent upon the continuing efforts of another. In the words of the Supreme Court Sinva "[has] been left to [its] own devices for realizing upon [its] rights." 320 U.S. at 348, 64 S.Ct. at 122.

Accordingly, I hold that the sugar futures contracts do not constitute "investment contracts" as that term is defined in the Securities Act of 1933 and the Securities Exchange Act of 1934. In reaching this conclusion it is significant that Congress elsewhere has recognized and dealt with possible abuses inherent in the sale of commodities for future delivery. Commodities Exchange Act of 1936, 7 U.S.C. §§ 1–17a. Though sugar and sugar trading are not yet included within the regulatory scope of the Commodities Act, see Robinson v. Bache & Co., 227 F.Supp. 456, 458 (S.D.N.Y.1964), such a fact in no way compels the conclusion that this court should fill the supposed void through an unwarranted extension of the securities legislation.

Thus the plaintiff cannot bring its claim within the purview of §§ 10(b) and 17(a) on the theory that the sugar futures contracts are actually "investment contracts" as that term is defined in the securities acts.

▮ Nevertheless, the allegations in the complaint go beyond condemnation of Merrill Lynch's activity with respect to the commodity contracts. There is a further claim that the unauthorized purchases were followed by a conversion of $58,041.25 from Sinva's New York *security* account. It is true that the activity of brokers "who [convert] money entrusted to them" or "who [sell] a customer's stock and [divert] the proceeds to their own pockets" may constitute a violation of § 10 of the 1934 Act as well as Rule 10b–5. See Cooper v. North Jersey Trust Co., 226 F.Supp. 972, 978 (S.D.N.Y. 1964). Similar conduct may violate § 17 of the 1933 Act. See S. E. C. v. Lawson, 24 F.Supp. 360 (D.Md.1938).

For this reason it is premature at this early stage of the proceedings to strike the allegations in the complaint charging violations of the securities acts. I am fully aware that the gravamen of this action concerns the allegedly unauthorized transactions in sugar futures. However, taking the allegations of the complaint in a light most favorable to the plaintiff, it does not "appear to a certainty that [Sinva] is entitled to no relief under any state of facts which could be proved in support of the claim" charging violations of §§ 10(b) and 17(a). 2 Moore, Federal Practice ¶ 12.08, at 2245 (2d ed. 1963).

If the transactions alleged here are viewed as a general deceitful scheme culminating in the conversion of $58,041.25 from plaintiff's New York security account, geographical limitations upon the operation of the securities legislation pose no significant barrier to the action. Compare Kook v. Crang, 182 F.Supp. 388 (S.D.N.Y.1960). The other essentials of violations of §§ 10(b) and 17(a) arguably can be established. See, e. g., S. E. C. v. Kelly, CCH Fed.Sec.L.Rep. ¶ 90,497 (N.D.Ill.1951); W. F. Coley & Co., 31 S.E.C. 722 (1950); D. S. Waddy & Co., 30 S.E.C. 367 (1949). See also O'Neill v. Maytag, 339 F.2d 764, 769 (2 Cir. 1964); Glickman v. Schweickart, 242 F.Supp. 670 (S.D.N.Y.1965); Barnett v. Anaconda Co., 238 F.Supp. 766 (S.D. N.Y.1965).

Accordingly, the motion to strike is denied. The motion to stay is also denied.

It is so ordered.