Leo P. McCURNIN, Jr., Plaintiff,

v.

KOHLMEYER & CO. and Jack D. Drake, Defendants.

Civ. A. No. 71-2138.

United States District Court, E. D. Louisiana, New Orleans Division.

March 10, 1972.

---

Peter G. Burke, New Orleans, La., for plaintiff.

Charles Kohlmeyer, Jr., Earl S. Eichin, Jr., New Orleans, La., for defendants.

ALVIN B. RUBIN, District Judge:

## OPINION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, McCurnin, a businessman, had some experience in dealing in stocks. He had an account with defendant, Kohlmeyer & Co., a stock and commodities broker, and he bought and sold various stocks from time to time. Prior to May 12, 1971, however, he had never traded in commodities.

On May 12, 1971, McCurnin began trading in commodities. He bought five contracts for December cotton, and sold these on May 18 at a profit. On May 20, he bought five more contracts of December cotton, and he sold these on May 24 at a profit.

While most of the facts concerning what happened thereafter are disputed, we accept for present purposes the plaintiff's version of what occurred for it is the defendant who moves for the summary judgment, and the defendant is entitled to this relief only if there is no genuine dispute as to a material fact or if the opposing party cannot recover as a matter of law even under his own version of events. See 6 Moore's Federal Practice § 56.15[3].

On May 25, McCurnin, while in New York, telephoned Drake, the Kohlmeyer employee with whom he dealt, and instructed Drake to buy 15 contracts of December cotton at a price not to exceed 33.30, 10 of them for himself and 5 for McCurnin & Swan, Inc., a corporation of which McCurnin was president. To realize the funds for margin requirements, he also instructed Drake to sell certain stocks in his account.

Drake entered orders as instructed at 9:30 a. m., but at 11:25 a. m. he cancelled them and entered orders for 15 contracts at 34.10. These were executed.

McCurnin returned to New Orleans later that day, and, upon learning that the cotton had been bought at 34.10, rebuked Drake. He asked Drake what relief was available, and Drake told him nothing could be done. McCurnin contends that, in truth, he had the right to reject the transaction, but Drake did not tell him this. He made a similar inquiry on May 26, and was again told that he had to keep what had been bought. On May 27, McCurnin met with Drake's supervisor and learned for the first time that he could have rejected the transaction. He then sold the contracts, but at a loss of $26,725.

McCurnin asserts claims against Kohlmeyer and Drake arising out of the Commodities Act, the Securities Act, the Securities Exchange Act, and, under pendant jurisdiction, claims arising under Louisiana state law for negligence and lack of due care under articles 2315 and 3003 of that Code.

## SECURITIES ACT

McCurnin argues that he was merely speculating in cotton futures. He had no intention of ever buying actual cotton, or receiving its delivery, or selling real cotton, or delivering it. Kohlmeyer induced him to buy commodities contracts as part of his "investment mix." Indeed he never even saw his contracts, nor had any idea of what was in them. If he wanted delivery of the cotton, he would get only a warehouse receipt. Thus he asserts he was not buying cotton, but was merely speculating in bookkeeping entries.

He then urges that these transactions were "securities" within the definition of 15 U.S.C.A. § 77b(1). 15 U.S.C.A. § 77q (Securities Act of 1933, § 17), lists certain actions that are pronounced unlawful "in the offer or sale of *any securities*." (Emphasis supplied). Similarly 15 U.S.C.A. § 78j(b) (Securities Exchange Act of 1934, § 10(b)) provides that certain acts employing any means or instrumentality of interstate commerce or the mails "in connection with the purchase or sale of any *security*. . . ." (Emphasis supplied). Further implementation of the statutory scheme is provided by Rule 10b–5 of the Securities and Exchange Commission.

But none of these are operative except with regard to a "security" or "securities" as defined in the relevant statutes. Before either the Securities Act or the Securities Exchange Act applies, it is necessary to prove that what was sold were "securities under the Act." SEC v. C. M. Joiner Leasing Corp., 1943, 320 U.S. 344, 355, 64 S.Ct. 120, 125, 88 L.Ed. 88; Tcherepnin v. Knight, 1967, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564.

The term "security" is defined in Section 2(1) of the Securities Act, adopted in 1933, 15 U.S.C.A. § 77b(1). The definition of this term in the Securities Exchange Act, adopted in 1934, 15 U.S.C.A. § 78c(a) (10), is "virtually identical" and is intended to be substantially the same. Tcherepnin v. Knight, *supra*, 389 U.S. at 336, 88 S.Ct. at 553. The definition does not refer to a commodity future contract, nor contain any term that can be fairly understood to embrace such a contract.

The Supreme Court has stated the test to be applied in determining what is a "security":

"The test . . . is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." SEC v. C. M. Joiner Leasing Corp., 1943, 320 U.S. at 352–353, 64 S.Ct. at 124.

Following this case, in Securities and Exchange Commission v. W. J. Howey Company, 1946, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244, the Court stated:

"[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a *common enterprise* and is led to *ex-*

*pect profits solely from the efforts of the promoter or a third party. . ."* (p. 298, 299, 66 S.Ct. p. 1103).

"The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." (p. 301, 66 S.Ct. p. 1104) (Emphasis supplied.)

The *Howey* test has been uniformly followed in this and other circuits. See Lynn v. Caraway, 5 Cir. 1967, 379 F.2d 943, 945; Continental Marketing Corp. v. Securities and Exchange Commission, 10 Cir. 1967, 387 F.2d 466, 470; Chapman v. Rudd Paint & Varnish Company, 9 Cir. 1969, 409 F.2d 635, 639.

■ There is no evidence that a commodity contract is commonly given the character of a security in commerce. The purchaser of such a contract is in no way participating in a "common enterprise" looking for his profits to come "solely from the efforts of others." A commodity future contract is just what its name implies: an undertaking to deliver or take delivery of a specified amount of the commodity at a specified time and place for a specified price.

A commodity future contract is no more or less than an option; the purchaser agrees to take delivery, or the seller agrees to make delivery, of a specified quantity of a specified commodity at a specified future time at a specified price. Unless the investor reverses his position timely by selling what he has bought or buying what he has sold, he must accept delivery of the commodity and pay the full purchase price as set by the contract (or deliver the commodity against full payment, if he has sold). He is in no way investing his money in a common enterprise, nor is he led to expect profits solely from the efforts of any third party. The "enterprise" is an individual one. The expectation of profit arises solely from the speculative hope that the market price of the underlying commodity will vary in his favor, permitting purchase or sale at a profit.

In Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., S.D.N.Y.1966, 253 F.Supp. 359, Judge Bryan reasoned:

"[T]he purchase of commodities futures involves no reliance upon the efforts of promoters, managers, employees, or any third party. The mere presence of a speculative motive on the part of the purchaser or seller does not evidence the existence of an 'investment contract' within the meaning of the securities acts. In a sense anyone who buys or sells a horse or an automobile hopes to realize a profitable 'investment'. But the expected return is not contingent upon the continuing efforts of another." 253 F.Supp. at 367.

See also Unreported Opinion of Judge Elliott, Wiggin v. Kohlmeyer & Co., M.D. Ga.1971, Civil Action 1305.

Nor did the arrangement between McCurnin and Kohlmeyer in opening and maintaining the trading account constitute an "investment contract" so as to come within the statutory definition of a "security." This was not a discretionary account. The power to buy or sell rested solely with McCurnin.

Because securities were sold to gain funds with which to buy cotton futures does not transform the cotton futures into "securities" and thus extend the coverage of the Securities Acts to whatever is purchased with the proceeds of the sale of securities.

This conclusion is likewise supported by the texts. Thus Loss, Securities Regulation, states:

"The line is drawn, however, where neither the element of a common enterprise nor the element of reliance on the efforts of another is present. For example, no 'investment contract' is involved when a person invests in real estate, with the hope perhaps of earning a profit as the result of a general increase in values concurrent with the development of the neighborhood, as long as he does not do so as part of an enterprise whereby it is expressly

or impliedly understood that the property will be developed or operated by others." At pp. 491–92.

In the Supplement, Professor Loss states:

"The court held in *Sinva* that commodity futures contracts were not 'investment contracts.' 'The mere presence of a speculative motive on the part of the purchaser or seller does not evidence the existence of an "investment contract."' Id. at 367. But commodity futures, like real estate or chattels, *can* be the basis of investment contracts and participations in profit-sharing agreements. Maheu v. Reynolds & Co., 282 F.Supp. 423, 426 (S.D. N.Y.1967), reargument denied, 282 F. Supp. 428, 429 (S.D.N.Y.1968) (discretionary joint commodities account with broker); Berman v. Orimex Trading, Inc., 291 F.Supp. 701 (S.D.N.Y. 1968) (same); SEC v. Commodity Brokerage Co., Inc., Litig.Rel. 3636 (W.D.Pa.1967) (consent injunction); cf. SEC v. Wickham, 12 F.Supp. 245 (D.Minn.1935), supra p. 489. And the Wisconsin Commissioner of Securities has ruled that commodity futures *per se* are not only 'interests in property,' a phrase not included in the federal definition, but also 'investment contracts.'" Monthly Bul., Feb. 1968 CCH Blue Sky L.Rep. ¶ 52,707."

In Bromberg, Securities Law, § 4.6 (352), 1969,

"A commodity future is not a security, even though it may be used for speculation in much the same way as a security. Sinva, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 253 F. Supp. 359, 365–367, CCH ¶ 91,672 (1964–1966 Transfer Binder) (S.D.N. Y.1966), subseq. opinion on other points, CCH ¶ 92,535 [48 F.R.D. 385] (S.D.N.Y. Dec. 12, 1969). Thus a sugar future is not an investment contract since it entails no reliance on efforts of third parties. Nor is it material that the investor does not intend to take delivery of the commodity itself.

"If the particular commodity is regulated by the Commodity Exchange Act, 7 U.S.C.A. §§ 1–17b, the investor has been accorded an implied federal cause of action for violation of the § 6b, a broad prohibition of cheating, defrauding, deceiving and false reports or statements. Goodman v. H. Hentz & Co., 265 F.Supp. 440, 446–447, CCH ¶91,911 (1966–1967 Transfer Binder) (N.D.Ill.1967); Anderson v. Francis I. duPont & Co., 291 F.Supp. 705, 710, CCH ¶ 92,358 (1967–1969) Transfer Binder (D. Minn.1968). Development of this cause of action will predictably parallel cases under the antifraud provisions of the Securities Acts. Regulated commodities are identified in § 2 and comprise generally food and agricultural products."

■ There is one aspect of the claim that may be established under the Securities Acts. This is the claim that the commodities transactions were followed by a conversion of $15,286.45 from Mr. McCurnin's security account to cover the net deficit in his commodities account. As the court said in Sinva, Inc., v. Merrill Lynch, supra, 253 F.Supp. at 367:

"It is true that the activity of brokers 'who [convert] money entrusted to them' or 'who [sell] a customer's stock and [divert] the proceeds to their own pockets' may constitute a violation of § 10 of the 1934 Act as well as Rule 10b–5. See Cooper v. North Jersey Trust Co., 226 F.Supp. 972, 978 (S.D.N.Y.1964). Similar conduct may violate § 17 of the 1933 Act. See S. E. C. v. Lawson, 24 F.Supp. 360 (D. Md.1938)."

For these reasons, there will be summary judgment for the defendant as to all claims under the Securities Act, except the conversion claim.

## COMMODITY EXCHANGE ACT

The CEA, 7 U.S.C.A. § 1 et seq. does not expressly provide for actions for

damages arising out of its violation. But such a cause of action has been repeatedly recognized. Goodman v. H. Hentz & Co., N.D.Ill.1967, 265 F.Supp. 440, 447; Booth v. Peavey Company Commodity Services, 8 Cir. 1970, 430 F. 2d 132; See United Egg Producers v. Bauer International Corp., S.D.N.Y.1970, 311 F.Supp. 1375 at 1384; Anderson v. Francis I. duPont & Co., D.Minn.1968, 291 F.Supp. 705 at 710.

Section 6b of the Act, 7 U.S.C.A. § 6b, provides, in part:

> "It shall be unlawful for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, (1) any contract of sale of any commodity in interstate commerce . . . made, or to be made, on or subject to the rules of any contract market, for or on behalf of any person. . . .
>
> (a) to cheat or defraud or attempt to cheat or defraud such person; .
>
> (b) willfully to make or cause to be made to such person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;
>
> (c) willfully to deceive or attempt to deceive such person by any means whatsoever in regard to any such order or contract, . . . or in regard to any act of agency performed with respect to such order or contract for such person; . . ."

McCurnin contends that Drakes' conversations with him contained false statements and that these were willfully made. If this can be proved, there is a cause of action for the damages suffered thereby. Goodman v. H. Hentz & Co., 265 F.Supp. 440 (N.D.Ill.1967). See Booth v. Peavey Co. Commodity Services, 8 Cir. 1970, 430 F.2d 132; United Egg Producers v. Bauer Inter. Corp., S.D.N.Y.1970, 311 F.Supp. 1375 at 1384.

The court notes that McCurnin has not specifically alleged that Drake's conversations with him contained false statements willfully made. It may well be

that further evidentiary development of this issue will show that there is no genuine evidence to support the conclusion that Drake willfully make false statements. If so, the motion for summary judgment on this aspect of the case may be renewed.