## In the Matter of the Arbitration Between PRUDENTIAL LINES, INC., Petitioner,

## and

## EXXON CORPORATION, Respondent.

## No. 81 Civ. 3016–CSH.

United States District Court, S. D. New York.

March 31, 1982.

5. This court would observe in passing that the L–A–D Foundation is a charity founded by the plaintiffs. Therefore it is unclear whether the plaintiffs might exercise any control over this property, as founders of this charity. However, this court recognizes that under the terms of the quitclaim deed the plaintiffs, as individuals, gave up any legal rights that they had in connection with the fee underlying the scenic easement.

Barrett, Smith, Schapiro, Simon & Armstrong, New York City, for petitioner; David Simon, William C. Clarke, Charles W. Gerber, John D. Vaughan, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for respondent; David A. Nourse, John P. Sandercock, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Reargument of this Court's June 17, 1981 memorandum was granted to further consider the question of whether the authority *vel non*, actual or apparent, of petitioner's surveyor to execute the certificate of redelivery was an arbitrable dispute. The briefs and oral arguments have focused upon whether that issue is collateral to the agreement between the parties and the disputes arising thereunder, *Rochdale Village, Inc. v. Public Service Employees Union*, 605 F.2d 1290, 1296 (2d Cir. 1979), or whether the issue "is inextricably tied up with the merits of the underlying dispute," and thus "wholly derivative of issues that fall within the scope of the arbitration clause." *McAllister Bros. v. A & S Transportation Co.*, 621 F.2d 519, 523 (2d Cir. 1980).

As the cited cases, the most recent Second Circuit authority in the field, demonstrate, the nature of the particular arbitration clause (broad or narrow) and the nature of the particular dispute (collateral or not) must be evaluated by the Court, if it is to apply the proper criteria for arbitrability. Reargument of the Court's endorsement of June 17, 1981, refusing to compel arbitration of petitioner's claim, was granted because the last paragraph of that order assumed without analysis that the issue of the surveyor's authority could be decided by the Court on the motion papers, and need not be submitted to the arbitrators. That assumption now receives further analysis.

Before considering in greater detail the Second Circuit's decisions in *Rochdale* and *McAllister*, it will be useful to briefly review the agreement between the present parties, and the dispute concerning which petitioner Prudential Lines, Inc. seeks arbitration.

Prudential's vessel was bareboat chartered for a term of years to respondent Exxon Corporation. (The names of the owner and the charterer in the charter party are those of the present parties' corporate predecessors.) At the end of the charter term, Exxon was obligated to redeliver the vessel to Prudential "in the same or as good order, condition and class" as at delivery, "unless the lack of good order, condition and class is due solely to ordinary wear and tear." Clause 16(a). Prudential seeks arbitration of its claim that Exxon redelivered the vessel in a substantially damaged condition, in breach of that obligation. Exxon contends that no arbitrable claim exists because Clause 16(b) and (c) provided, in essence, that at the time of redelivery surveyors appointed by the parties would jointly agree upon the repairs necessary to satisfy Exxon's obligation, and that Exxon would perform all such repairs before redelivery, Clause 16(d) then going on to provide:

> "Acceptance of the vessel by Owner shall be conclusive evidence of Charterer's compliance with any and all of the Charterer's obligations under this charter with respect to the vessel's class and condition at the time of redelivery."

A joint survey did in fact take place at the redelivery port. Exxon relies particularly upon a Certificate of Acceptance and Redelivery, executed by its surveyor and the surveyor representing Prudential, one Morrell. Execution of that certificate, in the

light of Clause 16, Exxon argues, extinguishes any claim for damage to the vessel. Prudential responds that Morrell lacked the authority, actual or apparent, to renounce or waive the substantial claim now sought to be submitted to arbitration.

Arbitration is provided for in two separate clauses of the charter party. The first reference to arbitration appears in Clause 13(d), the first sentence of which reads as follows:

"Should any dispute arise between the Owner and the Charterer in respect to the responsibility for repairs, renewals or replacements, or as to the condition of the vessel at the time of redelivery, the matter shall be decided by arbitration as provided in Clause 25."

The balance of Clause 13(d) relates to the manner in which repairs are to be effected in the event that arbitration results in a decision of charterer's liability. These provisions are not pertinent to the present issue.

Clause 25, referred to in the first sentence of Clause 13(d), provides:

"Should any dispute arise under this agreement, the matter in dispute shall be referred to three persons, one to be appointed by Owner, one by Charterer, and the third by the two so chosen; and their decision or that of any two of them shall be final, and their award may be made a rule of court and a judgment or decree entered thereon."

*McAllister, supra,* summarizes the first inquiry which a court must make in cases of this nature, and the consequences which flow from the answer. In determining whether a particular issue is arbitrable, Judge Feinberg wrote:

" . . . a court must first examine the potential scope of the agreement to arbitrate. If the arbitration clause is broad and arguably covers disputes concerning contract termination, arbitration should be compelled and the arbitrator should decide any claim that the arbitration agreement, because of substantive or temporal limitations, does not cover the underlying dispute. See, e.g., *Nolde*

*Bros., Inc. v. Local 358, Bakery & Confectionery Workers Union,* 430 U.S. 243, 254, 97 S.Ct. 1067, 1073, 51 L.Ed.2d 300 (1977) (arbitration clause requiring arbitration of all disputes between parties construed to require arbitration of Union claims for severance pay first raised after termination of contract). However, as we recently noted in *Rochdale Village, Inc. v. Public Service Employees Union,* 605 F.2d 1290, 1295 (2d Cir. 1979), when 'dealing with a narrower arbitration clause, a court's inquiry is not so circumscribed, and it will be proper to consider whether the conduct in issue is on its face within the purview of the clause.' Hence, if the arbitration agreement cannot reasonably be construed to cover disputes over whether the contract was in force during the relevant period, arbitration need not be compelled." 621 F.2d at 522.

Examples of broad and narrow arbitration clauses appear in the cases cited in *McAllister.* Thus the arbitration clause in *Nolde Bros.* is said to be broad; that collective-bargaining agreement provided, with admirable economy of phrase, for the arbitration of "all grievances." By way of contrast, the arbitration clause in the collective-bargaining agreement involved in *Rochdale* required arbitration of "any and all disputes hereunder." The Second Circuit said of that language:

"The insertion of the word 'hereunder' after the otherwise all-inclusive phrase 'any and all disputes' has the effect of limiting, albeit slightly, the parties' duty to arbitrate. All disputes arising 'under' the agreement are to be arbitrated; those that are collateral to the agreement are not." 605 F.2d at 1296.

As the foregoing quotation from the opinion shows, *McAllister* undertakes to summarize the different consequences that flow from the characterization of an arbitration clause as broad or narrow. "If the arbitration clause is broad and arguably covers" the dispute at issue, then "arbitration should be compelled and the arbitrator should decide any claim that the arbitration agreement, because of substantive or tem-

poral limitations, does not cover the underlying dispute." On the other hand, if the clause is narrow, "a court's inquiry is not so circumscribed . . . [i]f the arbitration agreement cannot reasonably be construed to cover" the dispute in question, "arbitration need not be compelled."

With all due respect to the effort at clarification undertaken in *McAllister*, certain obscurities remain, at least in my eyes. It is said that arbitration should be compelled if the clause is broad "and arguably covers" the dispute, but that arbitration need not be compelled if the agreement is narrow and "cannot reasonably be construed to cover" the dispute. What is the practical difference between these criteria? If the agreement "cannot reasonably be construed to cover" a dispute, how can it be said that it "arguably" does so, unless we are prepared to give heed to *unreasonable* arguments, an indulgence contrary to our professional training?

Additional obscurity arises from the fact that the draftsmen of the charter party in suit saw fit to include two provisions for arbitration, one of which could be construed as "broad," and the other as "narrow." As noted *supra*, Clause 13(d) provides for arbitration should "any dispute arise . . . in respect to the responsibility for repairs . . ." That language is reminiscent of the "any grievance" phrase which appeared in *Nolde Bros.* and was characterized as "broad" in *McAllister*; the reference to Clause 25 in the last phrase of the first sentence of Clause 13(d) is not necessarily inconsistent with that characterization, since it could simply be read as an incorporation of the mechanics of arbitration set forth in Clause 25. On the other hand, Clause 25, with its use of the phrase "under this agreement," must be characterized as "narrow" under the Second Circuit's holding in *Rochdale*.

However, I need not deal further with these considerations, since I conclude that, even on a narrow construction of the arbitration agreement in the case at bar, Prudential's claim for vessel damage arises "under the agreement" between the parties, and that the issue of its redelivery survey-or's authority "is inextricably tied up with the merits" of that dispute. It follows that the issue is not "collateral" to the agreement between the parties, and in consequence is arbitrable.

The meaning of a "collateral" dispute within this context is illustrated by *Rochdale* itself. Rochdale Village, Inc. was a cooperative housing development. It had a collective-bargaining agreement with the union representing its maintenance and security workers. The union sought arbitration of a dispute as to whether Rochdale violated the collective-bargaining agreement by subcontracting for certain services formerly provided by union members. Rochdale resisted arbitration on the ground that the collective-bargaining agreement had terminated. Two bases for that argument were put forward: first, that the duration clause of the contract had effected termination before the dispute over subcontracting came into existence; and secondly, that the parties had entered "into a separate, side agreement that the collective bargaining agreement would definitely terminate" prior to that time. 605 F.2d at 1296. The Second Circuit in *Rochdale* held that the first alternative basis for asserting contract termination was arbitrable. The court's proper function, the Second Circuit said, was "to ascertain whether any of the methods by which termination may have occurred was dependent on the construction or effect of terms of the contract." Answering that question in the affirmative, the Court observed:

> "The questions as to when the notice period began, and whether the Rochdale letter constituted compliance with the duration provision are questions arising 'under' the collective bargaining agreement. They depend on the construction or effect of the duration clause, and the dispute as to whether termination occurred in this manner falls within the scope of the arbitration clause. Thus, if termination did not occur by a means that was collateral to the agreement, this dispute was properly submitted to the arbitrator." *Ibid.*

By way of contrast, the asserted separate, side agreement, which Rochdale claimed had put an end to the collective-bargaining agreement in its entirety, was held to be a collateral dispute, not falling within the arbitration clause:

"If there was such an agreement it was collateral to the collective bargaining agreement. The latter agreement made no provision for alteration of the duration provision. The collective bargaining agreement was silent on the subject of any amendments to its terms; it contained nothing prohibiting or restricting amendment or requiring amendments to be in writing. Thus questions as to whether the parties entered into a side agreement or as to what the terms of such a side agreement were, do not arise 'under' the collective bargaining agreement. This issue was therefore beyond the scope of the arbitration clause and should have been determined by the court." Id. at 1297.

McAllister, supra, presented the question of whether a long-term towage assistance contract had been terminated in accordance with its terms. The Second Circuit held that the claim of termination, or "abandonment," was arbitrable, distinguishing the holding in Rochdale just referred to in the following words:

"In the present case, unlike Rochdale Village, the claim of abandonment is inextricably tied up with the merits of the underlying dispute; there is no colorable claim that the parties made a separate, collateral agreement to terminate the contract prior to its October 1978 expiration." 621 F.2d at 523.

Significantly, in directing arbitration in McAllister, the Court also cited Rochdale for the first prong of its decision, namely, "employer's defense of contract repudiation held arbitrable because dependent on resolution of arbitrable issues." Ibid.

In the case at bar, a central issue is whether Prudential's claim for redelivery damage is extinguished by the operation of Clause 16. That necessarily involves a consideration not only of what the individuals on the scene did, but whether they were authorized to do what they purported to do. Prudential claims that there is evidence in the record on the basis of which Exxon knew, or should have known, that surveyor Morrell did not have authority to sign away Prudential's claim. I say nothing about whether that claim of lack of authority should ultimately be accepted or rejected; but I am persuaded that Prudential's claim of lack of authority "is inextricably tied up with the merits of the underlying dispute," in McAllister's phrase and hence is arbitrable. I am reinforced in that conclusion by McAllister's quotation from United Steelworkers of America v. Warrior and Gulf Navigation Co., 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960), that "[d]oubts should be resolved in favor of coverage" and arbitration should be compelled "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Exxon argues in its latest brief that this presumption in favor of arbitrability should not be carried over from the field of labor disputes to that of commercial, maritime contracts. The answer to that argument is that the courts have done so repeatedly, McAllister itself being a recent example.

The presumption of arbitrability requires a party resisting arbitration to demonstrate with clarity that the disputed issue is "collateral" to the agreement containing the arbitration clause. That showing was made in Rochdale, where the contract between the parties relied upon as terminating the collective-bargaining agreement existed entirely separately and apart from the agreement, and nothing in the agreement foreclosed the existence of such an independent contract. In the case at bar, the question of the surveyor's authority does not depend for its resolution upon the interpretation of a separate, and hence "collateral," agreement between Prudential and Exxon.

Exxon argues that the question of the surveyor's authority to act is "collateral" because its resolution "is governed by common law principles of agency, not by the

terms of the charterparty" (supplemental brief at 15). That argument, carried to its logical extreme, would limit an arbitrator's function to a mere reading of the terms of the contract; he could not look to applicable rules of law without crossing into the forbidden territory of collateral non-arbitrability. But with Judge Werker of this Court, I reject this implicit definition of contract interpretation, within the context of arbitration, "as little more than to ascertain the plain meaning of words," *Pas-Ebs v. Group Health, Inc.*, 442 F.Supp. 937, 940 (S.D.N.Y. 1977). In point of fact, arbitrators frequently deal in their decisions with such legal principles as the acts and authority of agents or brokers,[1] choice of law,[2] duress and overreaching,[3] impossibility,[4] and waiver and estoppel.[5]

Exxon relies upon *Sinva v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 253 F.Supp. 359 (S.D.N.Y.1966), for the proposition that the issue of the redelivery surveyor's authority is not arbitrable. *Sinva* was an action by an investor against a broker for damages arising out of alleged unauthorized transactions in sugar futures contracts. The defendant moved to stay the litigation on the basis of an arbitration clause which it contended formed a part of the contract between the parties. The plaintiff investor contended that the agent in question did not have the authority to bind him to a contract containing the arbitration clause upon which defendant relied. This Court held that that particular question of agent's authority was for the Court, and not for the arbitrators. "Viewed in these terms," Judge Bryan wrote at 253 F.Supp. 362, "the issue is whether the parties ever executed an agreement to arbitrate, and if so, whether that agreement encompasses the dispute which is the basis of the lawsuit; ..."

The contract in question contained an "arising under" arbitration clause, which the Court characterized as "relatively narrow," *id.* at 364. Denying a stay pending arbitration, the Court held:

> "The pivotal question in this lawsuit plainly is whether Merrill Lynch, acting as Sinva's agent, had the authority to enter into the 77 sugar futures contracts on behalf of the plaintiff... By no means is [the arbitration clause] broad enough to embrace a controversy as to whether there was a meeting of minds in respect to the very contract incorporating the arbitration clause." *Ibid.*

In the case at bar, of course, no question is raised about the existence of the contract; the dispute relates to its performance. It is for the arbitrators to decide who did what to whom at the redelivery port, and by what authority. *Cf. Bressett v. International Talc Co., Inc.*, 527 F.2d 211, 215 (2d Cir. 1975) ("This is not an issue of whether there is a contract, but of what the contract requires, and is for the arbitrator."); *Oriental Realty Corp. v. Local 144*, 523 F.Supp. 441, 444–45 (E.D.N.Y.1981).

This Court's endorsement of June 17, 1981 is vacated. The petition to compel arbitration is granted. The Court will retain jurisdiction of the action in the event of further proceedings under the Federal Arbitration Act. In the interim, the case is transferred to the Suspense Docket of this Court pending arbitration.

It is So Ordered.

**1.** See cases summarized in *Index and Digest of the Award Service of the Society of Maritime Arbitrators* (Cohen, ed., 1979), at 388, particularly S.M.A. Award No. 1040:

> "Omissions or misrepresentations made by a broker whose conduct in the negotiations was indicative of their brokering on behalf of and in the best interest of charterer could not be attributed to owner. Hence, charterers'

claim for damages arising from such misrepresentations was denied."

**2.** *Id.* at 389.

**3.** *Id.* at 395.

**4.** *Id.* at 400.

**5.** *Id.* at 410–12.