**Lawrence JENSON et al.,
Plaintiffs,**

**v.**

**CONTINENTAL FINANCIAL CORPO-
RATION et al., Defendants.**

**Civ. No. 4–75–36.**

United States District Court,
D. Minnesota,
Fourth Division.

Nov. 19, 1975.

Chas. S. Zimmerman, Edw. Glickman, Minneapolis, Minn., for plaintiffs.

James H. O'Hagen, Minneapolis, Minn., for defendants.

## MEMORANDUM AND ORDER RE AMENDMENT OF COMPLAINT, SUMMARY JUDGMENT, AND APPOINTMENT OF RECEIVER

MILES W. LORD, District Judge.

Before the Court is a motion by the plaintiffs to amend their complaint and cross motions for summary judgment.[1] In addition, the plaintiffs have requested the appointment of a receiver and an accounting of all funds received by the defendants from the plaintiff investors should they prevail on their motion for summary judgment.

The plaintiffs and the class they purport to represent are investors who purchased gold and silver coins from the defendant, Continental Coin Exchange, Inc. The stock of the latter corporation is owned entirely by the defendant Continental Financial Corporation, which does business under the name of Continental Coin Exchange, Inc. (Hereinafter referred to as CCEX) The remaining defendant corporate entities are similarly related by virtue of their common ownership. The individual defendants are present and former officers, directors, brokers and/or employees of the defendant corporations.

The plaintiffs' first amended complaint contains seven counts which may be briefly summarized as follows:

Count I alleges fraud in the sale of securities pursuant to Section 17(a) of the Securities Act of 1933, as amended (15 U.S.C. § 77q(a)), Section 10(b) of the Securities Exchange Act of 1934, as amended (15 U.S.C. § 78j(b)), and Rule 10b–5 (17 C.F.R. § 240.10b–5); Sections 12 and 15 of the Securities Act of 1933, as amended (15 U.S.C. § 77*l* and § 77*o*); and Section 20 of the Securities Exchange Act of 1934, as amended (15 U.S.C. § 78t).

Count II alleges the sale of unregistered securities pursuant to Section 2(1) of the Securities Act of 1933, as amended (15 U.S.C. § 77b(1)); Section 5(a)(1) and (2), (b)(2), and (c) of the Securities Act of 1933, as amended (15 U.S.C. § 77e(a)(1) and (2), (b)(2), and (c) ); and Sections 12 and 15 of the Securities Act of 1933, as amended (15 U. S.C. § 77*l* and § 77*o*).

Count III alleges fraud in the sale of securities in violation of the Minnesota Securities Act, Minn.Stat. § 80A.01 and § 80A.03 (1973 Supp.).

Count IV alleges the sale of unregistered securities in violation of the Minnesota Securities Act, Minn.Stat. § 80A.-08, § 80A.14(m), and § 80A.23 (1973 Supp.).

Count V alleges a common law breach of a fiduciary duty.

Count VI alleges consumer fraud under the Minnesota Consumer Fraud Act, Minn.Stat. § 325.79 (1973 Supp.)

Count VII alleges false advertising under the Minnesota False Advertising Act, Minn.Stat. § 325.905 (1973 Supp.).

Because the facts and legal questions involved in this litigation are complex, the Court will discuss the merits of each motion separately.

### I. *Motion to Amend*

The plaintiffs have moved to amend their complaint pursuant to Rule 15, F.R.Civ.P.

---

[1]. Defendants initially filed a motion to dismiss. However, they attached affidavits to their motion. Therefore, the Court will treat their motion as one for summary judgment. Rule 12(b) F.R.Civ.P.

Rule 15 requires that amendments be freely allowed so long as they are made in good faith and no prejudice results to the non-moving party. *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The defendants have failed to demonstrate either bad faith on the part of the plaintiffs or that they will be prejudiced if the amendment is allowed. Therefore, the motion to amend is granted.

## II. *Summary Judgment*

The plaintiffs and defendants have filed cross motions for summary judgment as to liability on Count II of the amended complaint [2] which alleges that the defendants sold unregistered securities in violation of §§ 2, 5, 12 and 17 of the Securities Act of 1933. Accordingly, the Court, after considering all the evidence consisting of affidavits, answers to interrogatories, exhibits, certificates and other documents and material including memoranda of points and authorities, finds the following genuine facts to be undisputed:

### A. *Findings of Fact*

1. Defendant Continental Financial Corporation is a Minnesota corporation with its principal place of business formerly at 1840 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota, currently at 930 Hennepin Avenue, Minneapolis, Minnesota.

2. Continental Financial Corporation does business under the name of Continental Coin Exchange, Inc., (CCEX), a Minnesota corporation, and a wholly owned subsidiary, with its principal place of business formerly at 1840 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota, currently at 930 Hennepin Avenue, Minneapolis, Minnesota. CCEX does business in more than twenty (20)

states throughout the United States and sells its approximately 2000 customers directly by long distance telephone, wire services, mail and advertising placed throughout the United States.

3. Defendant Numisco Sales, Inc. changed its name to Continental Financial Corp. on November 5, 1973 without filing an official name change. The corporate directors of Numisco Sales, Inc. were the same as those for Continental Financial Corporation.

4. Defendant Continental Metals, Inc. is a Minnesota corporation with its principal place of business formerly at 1840 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota, currently at 930 Hennepin Avenue, Minneapolis, Minnesota. Defendant Continental Metals, Inc. is a subsidiary of Continental Financial Corporation and CCEX.

5. Defendant Continental Coin Galleries, Inc. is a Minnesota corporation, with its principal place of business at 930 Hennepin Avenue, Minneapolis, Minnesota. Continental Coin Galleries, Inc. is an operating division of Continental Financial Corporation, and operates as a retail sales outlet of CCEX in the sale of gold and silver coins and bullion to the public.

6. Defendant General Refineries, Inc. is a Minnesota corporation with its principal place of business at 292 Walnut Street, St. Paul, Minnesota. General Refineries, Inc. is a wholly owned subsidiary of Continental Financial Corporation and supplies precious metals to CCEX for offer and sale to the public in the investment scheme as outlined below.

7. Defendant Kent Froseth, a resident of Hennepin County, Minnesota, was at all times material herein an of-

---

2. The plaintiffs motion to amend their complaint was granted in the preceding section of this Memorandum. The amended complaint does not change the remedial theories upon which the plaintiffs have based their claims. Therefore, the Court will decide the summary judgment motion on the basis of the amended complaint.

ficer of Continental Financial Corporation, holding the offices of vice president and president, and a director and officer of CCEX holding the offices of secretary and vice-president.

8. Defendant Gary Wallin, a resident of Hennepin County, Minnesota, was at all times material herein an officer and director of Continental Financial Corporation, holding the office of president, and, an officer and director of CCEX holding the offices of treasurer and president, and, a director of defendant Continental Metals, Inc.

9. Defendant Thomas Haley, a resident of Scott County, Minnesota, was at all times material herein a director of CCEX.

10. Defendant Thomas Vickman, a resident of Hennepin County, Minnesota, was at all times material herein an officer of Continental Financial Corporation and CCEX.

11. Defendant Glen Youman, a resident of Hennepin County, Minnesota, was at all times material herein a director of Continental Financial Corporation.

12. Defendant Arthur Kydd, a resident of Ramsey County, Minnesota, was at all times material herein a director, incorporator and shareholder of Continental Financial Corporation and a director and incorporator of Numisco Sales, Inc.

13. Defendant James Gergen, a resident of Ramsey County, Minnesota, was at all times material herein a director and shareholder of Continental Financial Corporation.

14. Defendant William Brandt, a resident of Hennepin County, Minnesota, was at all times material herein an officer of CCEX.

15. Defendant Richard V. Martinson, a resident of Hennepin County, Minnesota was at all times material herein an incorporator, director, officer and majority shareholder of Continental Financial Corporation and in addition, he was the incorporator and director of Numisco Sales, Inc., of Hennepin County, Minnesota.

16. Defendant Richard Newham, a resident of Hennepin County, Minnesota, at all times material herein was an officer and broker of CCEX.

17. Defendant Harvey A. Carlson was at all times material herein employed by Continental Financial Corporation and CCEX as a manager of operations of CCEX and is a resident of Hennepin County, Minnesota.

18. Defendant Dale Anderson, defendant Robert J. Harnan and defendant Kenneth Kaminsky were at all times material herein employed by Continental Financial Corporation and CCEX as brokers and are residents of Hennepin County, Minnesota.

19. Representative Plaintiffs Randal Jenson, Lawrence Jenson, Duane Steil, Barry Vernick, John Musil, David A. Skare, E. R. Boedecker, W. O. Sletten, Jerry Campbell, A. L. Lancette, Felix A. Ricco and Paul Reynolds are all residents of the State of Minnesota.

20. Representative Plaintiffs D. R. Bentz, Howard I. Barton, and Jane E. Barton at all times material herein have been and are residents of the State of Wisconsin.

21. Representative Plaintiffs William K. Maas, John H. Lind and Hansen, Lind & Meyer, a partnership, are residents of the State of Iowa.

22. Representative Plaintiff Douglas J. Fredericks is a resident of the State of New York.

23. Representative Plaintiff Lewis S. Meyers has been and is a resident of the State of Illinois.

24. The defendants have been making use of the mails, and means and instruments of transportation and communication in interstate commerce and instrumentalities of interstate commerce, including interstate telephone calls and interstate telex messages to offer for sale and to sell and deliver their contracts for the sale of coins.

25. No registration statement has been filed or is in effect with the Securities and Exchange Commission under the Securities Act of 1933, as amended, with respect to any gold coins, or silver coins offered for sale and sold by the defendants.

26. CCEX sells and repurchases U. S. silver coins, silver bullion and gold coins to the public and creates a market in said investments.

27. The silver coins sold by CCEX are all minted prior to 1965 (after which date, the U. S. discontinued the making of solid silver coins and began to mint "clad" coins, with non-silver centers). The silver coins are packed in canvas bags, each of which contains One Thousand Dollars ($1,000.00) of face value coins. Each bag weighs about fifty-five (55 lbs.) pounds, approximately the size of a bowling ball and is said to contain an average of 720 troy ounces of .99 fine silver.

28. CCEX also sells silver bullion in "bars" of one hundred (100) to one thousand (1,000) troy ounces of .999 fine silver, and various types of gold coins including British Sovereigns, U. S. Double Eagles, Mexican Pesos, Austrian Coronas.

29. CCEX operates a nationwide sales organization and purchasers have invested approximately $135–140 million with CCEX for the cash and margin purchases of silver coins, gold coins and silver bullion.

30. CCEX solicits investments in precious metals through a nationwide marketing and promotional campaign, and was engaged until recently in the business of selling these precious metals to the general public as an investment and not for numismatic purposes.

31. CCEX investors had varying degrees of sophistication and experience and relied in part upon CCEX and its brokers for input on investment decisions. Yet, the defendants indicate that the training required of its salesmen only included the reading of books and CCEX's literature and listening to another salesman for a week or so.

32. CCEX publicly holds itself out as willing to buy and sell precious metals. CCEX uses a sales technique of insuring investors that they make a market in said precious metals and that said investments are liquid. In fact CCEX calls itself an "exchange". In reality, however, they are not obligated to purchase margin investments bought from other sources, or even from their own customers. Further, customers margin contracts. are not generally assignable.

33. CCEX describes itself as an "exchange". It is not however, an exchange in the sense of a typical stock or commodities exchange which matches buyers and sellers. CCEX does not match buyers and sellers, but rather acts as a principal in each of the sales and hedging transactions.

34. CCEX has been offering for sale and selling gold coins, silver coins and silver bullion bars to plaintiffs and have been representing to the prospective purchasers and purchasers that:

a. Precious metals are sold as an investment.

b. The price of silver will rise.

c. An investment in gold coins or silver coins and silver bullion will avoid the evils of inflation, deflation, depression and is a better investment than in the stock market.

d. CCEX agrees to deliver gold coins, silver coins and silver bullion to investors.

e. All purchasers of gold and silver coins pay a fixed percentage mark-up and all sellers of such coins must take a fixed percentage discount, each of which is called a "commission" which is calculated at two percent (2%) of the base price. No payment is made to a salesman when an investor sells his investment.

f. CCEX is a reputable company which has substantial assets as audit-

ed by a national accounting firm and have strong financial backing.

g. In addition to the base price and the commission, the margin purchasers must pay an "interest charge" on the unpaid balance of the sales price. These "interest charges" amounted to approximately two million dollars ($2,000,000.00) in revenues for CCEX.

h. The base price of which an investor may buy or sell silver or gold is determined by CCEX. This price is set by the seller's evaluation of a number of factors, including the price of commodity futures contracts for such coins, the spot price for such coins, quoted by wholesale coin dealers, spot price for silver bullion, the price of commodity futures for silver bullion, the number and relative balance of buy and sell orders received and general economic conditions. The price for other commodities is set in a similar fashion. CCEX claims that the base price is the same at any given time for both purchases and sales, i. e., they are willing to buy and sell at the same price.

i. CCEX promotes the concept of investing in silver through margin purchases. The advertising literature is replete with comparisons of the price performance of silver and other forms of investments such as common stocks. CCEX promotes the concept that silver provides an exceptional hedge against inflation. Advertising materials stress: the near inevitability of continually increasing silver prices and highlight statistics showing that annual consumption of silver exceeds production; that the annual production deficit is increasing; and that the purity of silver is guaranteed and investment in silver is better than in the stock market. Sales literature is aimed at inducing investors to purchase margin contracts as opposed to making cash and carry purchases, by pointing out that the greater profits may be possible through a leveraged investment. CCEX publishes a periodic "report" or "newsletter" containing articles on silver and gold and stressing the desirability of investing in such commodities on margin contracts from them. As part of CCEX's advertising campaign they stress their sound financial backing and substantial assets as audited by the national accounting firm of Touche Ross & Company. Additionally, defendants admit that from time to time they provide their customers with investment advice.

j. CCEX will repurchase gold coins and silver at the investors desire at no less than a specified published price minus a brokerage commission.

k. CCEX maintained and staffed a research department to distribute to investors investment information.

35. CCEX always stood ready to make repurchases of items which it sold to its customers, even though under the terms of its agreements with its customers, it was not obligated to make such repurchases.

36. A CCEX investor of any of the above described items may purchase for cash and take immediate delivery, or he may invest by purchasing a margin contract.

37. With regard to silver coins approximately ninety percent (90%) of all investors purchased on margin rather than purchase for cash and take actual delivery.

38. The investors who purchase on margin contracts pay between fifteen to thirty-three percent (15–33%) of the purchase price down. Margin contract investors may, at any time either take delivery by paying the balance of the purchase price on their margin contract, plus all "interest", "commission", "storage charge" and freight, or they may "close-out" their contracts by asking the company to repurchase.

39. Once the CCEX margin account investor has paid his down payment,

title to this money passes to CCEX. In addition, CCEX has title to whatever interest the investor has in the items purchased by CCEX as cover or hedge, unless and until the investor pays the unpaid balance of his margin contract in full, plus extras.

40. Approximately ninety percent (90%) of all margin account investors close out their account without delivery. Thus the typical margin account investor does not take or expect to take actual delivery of his commodity and must be characterized as a speculator, rather than an actual user of the commodity.

41. When a margin investor closes out his account, he receives or pays the difference between the per unit price at which his position is closed out and the amount he owes on margin, plus applicable interest, storage and commissions.

42. Margin purchasers are subject to margin calls at any time and thus may be required to pay additional amounts on their account at the option of CCEX.

43. CCEX is not obligated to repurchase an investor's coins which he had purchased from CCEX. CCEX will not purchase a customers' margin contract which an investor has acquired from another company, as a matter of practice, but has done so on some occasions. Further, customers' margin contracts are not generally assignable.

44. The margin payments made by each investor are pooled by CCEX and invested by the company in its own name. The company uses the profits from these investments, if any, as a hedge against its potential liability to its customers.

45. CCEX are not obligated to hedge all or any portion of their sales in a particular manner. However, CCEX claims it hedges close to one hundred percent (100%) of its sales. (Ninety-five percent (95%) according to Gary Wallin, Affidavit, ninety-seven

to one hundred three percent (97–103%) according to Affidavit of Thomas Vickman). CCEX primarily hedges its obligations to its customers by either purchasing the actual coins and taking physical possession of them or by purchasing commodity futures or forwards contracts. In practice, only an insignificant portion of CCEX sales are actually covered by coins, which the company owns and physically possesses. The substantial majority of the company's sales are hedged by purchase of futures or forwards contracts.

46. CCEX may profit from investing the funds paid by investors which are not used for hedging; that is, when a customer makes a margin purchase he pays between twenty-five to thirty-five percent (25–35%) of the base price in cash. When CCEX hedges such a sale with the purchase of a commodity futures contract, it pays only a fraction of the cost of the futures contract in cash and carries the balance on margin. The size of the cash deposit which CCEX is required to make on commodities futures contract purchases varies, but is substantially less than the cash deposited by the margin account investors.

47. CCEX uses this excess cash or "float" for short term investments, and the profit realized on these investments belongs to CCEX.

48. The preservation of the corpus of the "float" however, is essential to CCEX's ability to pay the balance due or owed on the commodity futures contract with which it has hedged sales to investors, or to pay cash to investors upon the closing out of the investor's contract.

49. As the commodity futures contract with which CCEX has hedged its sales comes close to delivery date, CCEX must make a fundamental investment decision. Pay the balance owing on the contract and take actual delivery of the commodity or roll the

contract over by selling the contract and replacing it with a contract for a more distant month. Delivery is seldom taken. CCEX maintains a trading department to perform these functions.

50. In conducting the hedging operations, CCEX is trading for its own accounts and all purchases and sales of futures contracts are made by CCEX as principals and not as agents. If the market value of the commodity futures owned by the company increases, it may "draw out" a portion of the excess equity in its account. Such cash may then be pooled with the work capital of the company and invested as CCEX claims.

51. Whatever method of hedging is used by CCEX, there is no segregation of specific unit of hedge for a specific margin contract investor. Thus a margin contract investor cannot say that his contract is hedged or covered by an identifiable commodity futures or forwards contract. CCEX sales are only hedged in the sense that their aggregated hedge from all sources is said to be approximately equal to their aggregate obligation to deliver under their margin contracts.

52. CCEX holds itself out to the general public as dealing in securities by advertising itself as such under the "Investment Securities" Section of the Minneapolis telephone directory, classified pages, January 1975. It does *not* hold itself out to the general public as dealing in commodities by advertising itself as such, in the "Commodity Brokers" Section of the Minneapolis telephone directory, classified pages, January 1975.

B. *Conclusions of Law*

As previously stated, before this Court are cross motions for Summary Judgment as to liability on Count II of the amended complaint which alleges that the defendants sold unregistered securities (namely investment contracts)[3] in violation of §§ 2, 5, 12 and 17 of the Securities Act of 1933. The defendants counter this argument with their own motion for summary judgment contending that the Court is without jurisdiction over this action since they were engaged in the sale of commodity futures contracts and not securities.[4] The plaintiffs have based their jurisdictional allegations entirely on the Securities Act of 1933 and the Securities Exchange Act of 1934. Jurisdiction over the state claims is invoked pursuant to the doctrine of pendent jurisdiction. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Consequently, if it is determined that the defendants did not sell securities, the action must be dismissed for lack of subject matter jurisdiction.

The defendants, through CCEX sell gold and silver coins to the public. Investors have the opportunity of purchasing coins either on a cash basis and taking immediate possession or on margin. Margin investments constitute approximately 90% of CCEX's business.

Margin investors pay between 15% to 33% of the base price of the coins in

---

3. 15 U.S.C. § 77b(1), Securities Act of 1933, defines a security as follows:

    The term "*security*" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract* . . . .

4. The Court notes that this is not the only litigation which the nature of the defendants business has been questioned. The Wisconsin Securities Commission concluded that the defendants sale of coins represented the sale of securities; American Coin Exchange, et al., Commissioner of Securities State of Wisconsin (May 17, 1974) the Indiana Securities Commission reached the same conclusion, Indiana Securities Division Order No. 74–0463 (September 19, 1974). Similarly, the Commissioner of Securities for the State of Minnesota has instituted a suit against Continental Coin, et al., in the Hennepin County District Court.

    The defendants discontinued the nationwide sale of coins on margin in December of 1974.

cash and receive the right in the future to obtain the coins specified in the contract or the current market price of the coins, less any amount owing on the contract. As a practical matter, 90% of CCEX's margin customers request that CCEX repurchase their contract rather than taking actual possession of the coins. Thus, the typical margin customer of CCEX is nothing more than a speculator in coins. By investing on margin, the investor gambles that the market price of the coins will rise above the contract price so that the investor can cash in his position and receive a profit measured by the difference between the contract price and the market price less any interest costs owing to CCEX.

The defendants argue that this method of business represents the sale of a standard commodity futures contract. In addition, they argue that a commodity futures contract is not an investment contract (security) within the meaning of the Securities Act of 1933.

■ It is the Court's view that the defendants are correct in their contention that the sale of a commodity futures contract is not an investment contract (security) within the meaning of the Securities Act of 1933. *Sinva v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 253 F.Supp. 359 (S.D.N.Y. 1966); *Schwartz v. Bache & Co., Inc.*, 340 F.Supp. 995 (S.D.Ia.1972). However, the plaintiffs do not argue that the sale of the coins standing alone constitutes an investment contract. It is their position that the defendants method of operation transforms what is made to appear as the sale of a commodities futures contract into an investment contract.

The crux of the plaintiffs argument centers around CCEX's use of investor funds. The money paid by each investor is pooled by CCEX. The pool of funds is then invested by CCEX in its own name. The substantial majority of the time the funds are invested in commodi-

ty futures contracts. The plaintiffs argue that CCEX's investors are dependent upon the success of these investments to obtain a profit since the investor can only look to CCEX for performance of his contract. In each transaction, CCEX acts as a principal therefore limiting the marketability of the investment. Contracts purchased from other sources are generally not honored by CCEX, nor will CCEX's competitors honor its contracts. It is this latter method of operation which the plaintiffs contend transform the defendants sales program into the sale of investment contracts and not standard commodity futures contracts as they claim.

The starting point for determining whether the defendants sold investment contracts is the now familiar definition of an investment contract as outlined by the Supreme Court in *S.E.C. v. Howey*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (hereinafter cited as *Howey*):

> The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.

■ This test involves three elements: 1) an investment of money; 2) in a common enterprise; 3) with profits to come solely from the efforts of others. *S.E.C. v. Koscott Interplanetary, Inc.*, 497 F.2d 473 (5th Cir.1974); *S.E. C. v. Glen W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir.1973), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). The first element is obviously met by the fact that the plaintiffs purchased gold and silver coins from the defendants, and thus the following discussion will focus on the remaining parts of the test.

### 1. Common Enterprise

■ The investment in *Howey* involved the sale of land contracts for units of a citrus grove together with a service contract for cultivating and marketing the crops. The Court of Appeals

determined that a common enterprise did not exist stressing that each investor was depending upon his own unit of acreage for profits and not upon the entire grove. *S.E.C. v. Howey*, 151 F.2d 714 (5th Cir.1945), *rev'd.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

In reversing, the Supreme Court emphasized that the relevant facts to be considered in determining whether a common enterprise existed were not whether profits were pooled but whether the success of the enterprise depended upon the efforts of the promoter:

> Such persons [investors] have no desire to occupy the land or to develop it themselves; they are attracted solely by the prospects of a return on their investment. Indeed, individual development of the plots of land that are offered and sold would seldom be economically feasible due to their small size. Such tracts gain utility as citrus groves only when cultivated and developed as component parts of a larger area. A common enterprise managed by respondents or third parties with adequate personnel and equipment is therefore essential if the investors are to achieve their paramount aim of a return on their investments. 328 U.S. at 300, 66 S.Ct. at 1103.

More recently the Court of Appeals for the Ninth Circuit has defined common enterprise to mean, "one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." *S.E.C. v. Glen W. Turner Enterprises, Inc., supra*, 474 F.2d at 482. That case involved the pyramid franchising of business promotional courses. A common enterprise was held to exist because the efforts of the promoter were essential to the success of the investor.

Other cases involving differing fact situations have similarly relied on the relationship of the investor and promoter in determining whether a common enterprise exists. *S.E.C. v. Koscott Inter-planetary, Inc., supra*, (Sale of Franchises); *Mitzner v. Cardet International Inc.*, 358 F.Supp. 1262 (N.D.Ill.1973) (sale of distributorships); *Marshall v. Lamson Bros. & Co.*, 368 F.Supp. 486 (S.D.Ia.1974) (discretionary commodity futures trading accounts); *Continental Marketing Corporation v. S.E.C.*, 387 F.2d 466 (10th Cir.1967) *cert. denied*, 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (1968) (live beavers); *Los Angeles Trust Deed and Mortgage Exchange v. S.E.C.*, 285 F.2d 162 (9th Cir.1960), *cert. denied*, 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241 (1961) (trust deeds); *Glen-Arden Commodities v. Costantino*, 493 F.2d 1027 (2nd Cir.1974) (Scotch Whiskey).

The fact that a common enterprise has been held to exist in so many different fact situations reflects the intent of courts to examine the economic realities of the relationship between the investor and promoter, and not exalt form over substance. As noted by the Supreme Court in *S.E.C. v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 351, 64 S.Ct. 120, 88 L.Ed. 88 (1943):

> In the Securities Act the term "security" was defined to include by name or description many documents in which there is common trading for speculation or investment. Some, such as notes, bonds, and stocks, are pretty much standardized and the name alone carries well settled meaning. Others are of more variable character and were necessarily designated by more descriptive terms, such as "transferable share," "investment contract," and "in general any interest or instrument commonly known as a security." We cannot read out of the statute these general descriptive designations merely because more specific ones have been used to reach some kinds of documents. Instruments may be included within any of these definitions, as a matter of law, if on their face they answer to the name or description. However, the reach of the Act does not stop with the obvious and commonplace. Novel, uncommon,

or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as "investment contracts" . . . .

Taking these standards into consideration and viewing the substance of the defendants relationship with the plaintiff investors, it is clear that a common enterprise exists.

Defendant CCEX, sold coins in two different ways—either by cash payment in full in return for immediate delivery of the coins or on margin. Margin purchases accounted for approximately 90% of CCEX's sales.

Rather than paying the full contract price at once, margin investors pay 15 to 33% of the base contract price in cash in return for the option of receiving, in the future, the commodities specified in the contract or the current market price of such commodity, less any amount owing on the contract. Basically, the margin buyer makes a down payment with the hope that the price of the coins will rise thereby insuring a profit measured by the difference between the prevailing market price and the price at which the commodity was purchased. This enables the investor to realize a profit without having to pay the full price of the commodity initially.

Indeed, the plaintiff investors were representative of this speculative mentality. Although the margin investor is entitled to receive delivery of the actual coins, only 10% of CCEX's customers chose to do so; the remaining 90% closed out their positions by asking CCEX to repurchase their investment. Thus, in the typical margin transaction neither the investor nor CCEX contemplate that the coins purchased will ever change hands.

Margin purchasing is encouraged by CCEX in its sales literature because it provides CCEX with a source of working capital. The cash advanced by each margin investor is pooled by CCEX with the cash advanced by all other investors. This pool of funds is invested by CCEX in its own name; CCEX has complete discretion as to how the funds are invested.

CCEX invests this pool of funds in various ways. However, the method used the substantial majority of the time is for CCEX to purchase commodity futures contracts as a hedge against its obligations to its investors.

Further, the relationship of CCEX to its customers is that of principal and not agent. That is, the individual investor may only look to CCEX for performance of his contract. CCEX will not recognize contracts from other companies, nor will other companies recognize CCEX's contracts. In addition, the assignability of the investor's contract is limited. The contract can only be assigned if the assignee first pays any money owed to CCEX by the assignor.

The obvious result of this method of business operation is that the marketability of the investor's contract is limited to the performance of CCEX. Moreover, the ability of the plaintiff investor to receive a profit is dependent upon the success of CCEX in positioning itself in the commodities market. If by their investment in commodity futures contracts, CCEX does not preserve at least the corpus of the pool of investor funds, the likelihood of the investors obtaining payment is correspondingly affected. In short, the value of the investor's contract is dependent upon the solvency of CCEX or, in the words of the Court of Appeals for the Ninth Circuit, "the fortunes of the investor are interwoven with and dependent upon the efforts and success of [the defendants]". *S.E.C. v. Glen W. Turner Enterprises, Inc., supra,* 474 F.2d at 482.

The defendants argue that in determining whether a common enterprise exists the principal question is whether the investor is dependent upon the promoter for the *derivation* of his profits and not for the *payment* of his profits. It is their position that the derivation of

the plaintiffs profits is dependent upon the operation of the commodity futures market and therefore no common enterprise exists.

The crucial determination as stated earlier is whether the fortunes of the investor are dependent upon the success of the promoter. Even assuming that the investor's profit is derived from the operation of the market, and the market price rose entitling the investor to a profit, the defendants would be unable to pay the profit if they improvidently invested the pool of investor funds. Since the investor may only look to the defendants for the performance of his contract, he is absolutely dependent upon the business acumen of the defendants in successfully investing the pool of investor funds and thereby remaining solvent. Thus, the distinction between derivation and payment of profits becomes meaningless in the context of the defendants method of operation.

The defendants cite as authority for this distinction *Sinva v. Merrill Lynch, Pierce, Fenner and Smith, Inc., supra,* (hereinafter cited as *Sinva*) and *Schwartz v. Bache & Co., Inc., supra.* This Court does not read the above opinions as authority for the defendants argument. Rather, those cases actually stand for the defendants central argument, i.e. that they sold commodity futures contracts which are not investment contracts. However, a close analysis of the facts reveals that the defendants were selling more than just a standard commodity futures contract.

As noted by the Court in *Sinva,* "Futures contracts generally are simply agreements for the delivery of a specified quantity of a commodity, . . . on any day in a given future month." 253 F.Supp. at 366. The primary distinction between an investment contract and a standard futures contract is that in the latter the investor has complete

and absolute dominion over his investment, and thus no common enterprise exists between the investor and the promoter. The profitability of the investment is solely dependent upon the operation of the commodities market and the investors own investment decisions. Profitability is not dependent upon the efforts of the promoter; the investor is left "to [his] own devices for realizing upon [his] rights." *Sinva,* 253 F.Supp. at 367.[5]

It is apparent from this latter description that the defendants sale of coins entailed more than simply the sale of commodity futures contracts. Unlike the standard commodities contract, the plaintiff investors profits were dependent upon the defendants efforts in successfully investing the pool of investor funds. Further, the defendants entire method of operation is distinguishable from normal commodity futures trading.

The distinction between the defendants operation and normal commodity futures trading was outlined by the Wisconsin Securities Commission in response to the Securities Commission's charge that the defendants and other similar coin dealers were selling securities. With the same facts before it, the Commission concluded that the defendants were engaged in selling securities and made the following observation with respect to the defendants argument that they were selling only commodity futures contracts:

It is clear in this case that the contracts sold by the companies are more than mere margin or credit sales of a commodity. The advertising material stresses the value of these arrangements as investments. The margin contract investors are led to believe they will be able to close out their position with the selling company. Only an insignificant percentage of

5. For additional discussion of the characteristics of the standard commodity futures contract *see* Long, "The Naked Commodity Option Contract as a Security." 15 Wm. & M.L. Rev. 211, 232–234 (1973).

those who purchase on margin ever request delivery. The greatest number expect to, and do in fact, close out their contracts without taking delivery. Each of the companies holds itself out as willing and able to repurchase coins or contracts from its investors and, although the companies argue that they are not obligated to make such repurchases, it is clear that the investors rely on the expectation that the repurchases will be made if requested. Investor reliance is demonstrated by the fact that repurchases are requested and made in more than 90% of all margin sales, and by the fact that there is no other ready sales market for such investors. A contract issued by one company is not accepted by any other company. Even if an investor takes physical possession of his coins, he cannot resell them to another company unless he invests the net proceeds in that company's margin contract. The wholesale market for such coins does not appear to be reasonably available to the individual investor without economic sacrifice. It is clear, therefore, that the margin contracts contemplate more than the margin or credit sale of a commodity. *In matter of American Coin Exchange, et al.,* Commissioner of Securities, State of Wisconsin, (May 17, 1974) at 21–22.

It is thus clear that the defendants operation entailed more than just the sale of a standard commodity futures contract. By virtue of their pooling of investor payments and then investing such funds in their own name, the defendants transferred the risk of their operation to the plaintiff investors who thereby became partners in a common enterprise with the defendants.

### 2. *Profits Derived Solely From the Efforts of Others*

This third requirement of the *Howey* test has been the source of some difficulty. The language used by the *Howey* court requires that profits come solely from the efforts of others in order for an investment contract to exist. Taken literally, this would require the investor to assume a completely passive role in the handling of his investment.

Recent cases, however, have rejected such a restrictive interpretation of this language reasoning that such an approach would defeat the remedial purposes of the Securities Acts. *S.E.C. v. Glen W. Turner Enterprises, Inc., supra; Mitzner v. Cardet International, Inc., supra.*

In *S.E.C. v. Glen Turner Enterprises, Inc., supra,* the court was faced with determining whether a pyramid franchising scheme was an investment contract. The investor purchased an adventure plan empowering him to sell plans to other purchasers. In order to enhance his profits, the investor was required to find other prospective investors and sell them adventure plans. The more plans the investor sold, the greater his profits.

In concluding that this effort on the part of the investor did not foreclose the finding of an investment contract, the Court stated:

> Strict interpretation of the requirement that profits to be earned must come "solely" from the efforts of others has been subject to criticism. . . . Adherence to such an interpretation could result in a mechanical, unduly restrictive view of what is and what is not an investment contract. It would be easy to evade by adding a requirement that the buyer contribute a modicum of effort. Thus the fact that the investors here were required to exert some efforts if a return were to be achieved should not automatically preclude a finding that the plan or adventure is an investment contract. To do so would not serve the purpose of the legislation. *Rather we adopt a more realistic test, whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or*

*success of the enterprise.* 474 F.2d at 482. (Emphasis added).

Other cases have adopted this broader interpretation of the "solely from the efforts of others" language.

*S.E.C. v. Koscott Interplanetary, Inc., supra; Mitzner v. Cardet International, Inc., supra; Marshall v. Lamson Bros., supra; Los Angeles Trust Deed & Mortgage Exchange v. S.E.C., supra.*

This Court is persuaded that the broader interpretation of this language and the test as outlined in *S.E.C. v. Glen W. Turner Enterprises, Inc., supra,* is both more reasonable in light of the purpose of the securities acts and consistent with the conclusions in *Howey.* Moreover, viewing the defendants activities in this light, it is clear that their activities were the essential managerial efforts which affected the success or failure of the enterprise.

The defendants argue that they do not provide the essential managerial efforts, affecting the success or failure of the enterprise in that the investor's profit or loss is determined solely by the fluctuations in the market price of the commodity. This is similar to the argument presented by the defendants with respect to their contention that no common enterprise exists. However, as noted previously in discussing the common enterprise element, the value of the investor's margin contract is dependent upon more than just the fluctuation of the market price of the commodity.

This conclusion results from several facts. First, the defendants take the margin payments of each investor and pool them. This pool is invested by the defendants in an account in their own name. The defendants have absolute discretion as to how this pool of funds is invested; the substantial majority of the time the funds are invested in commodity futures contract. Secondly, the marketability of each investors contract is limited. An investor may only look to the selling company for performance of his contract. If the defendant companies were unable to perform the contract, the plaintiffs investment would be valueless.

This mode of operation, therefore, creates certain liabilities for the investors. First, the value of the investors contract is dependent upon the solvency of the defendants since the contract can only be marketed through the defendants. Further, the solvency of the defendants is dependent upon their ability to profitably invest the investors funds which they have pooled. Since the majority of the defendants investments of the pool are in the form of speculative commodity futures contracts, both the risk assumed by the investors and their reliance on the abilities of the defendants is substantial.

Consequently, it is clear, contrary to the assertions of the defendants, that although the investor's potential profit is measured by the fluctuations in the market, his ability to realize that profit is absolutely dependent upon the managerial efforts of the defendant; therefore the third element of the *Howey* test is satisfied.

Based upon the foregoing discussion, the Court concludes that the defendants were engaged in the sale of investment contracts (i.e. securities) as defined in *Howey.* Accordingly, there being no genuine issues of material fact and the plaintiffs being entitled to a judgment as a matter of law, their motion for summary judgment as to liability on Count II of the first amended complaint is hereby granted.

### III. *Receiver and Accounting*

In addition to their motion for summary judgment, the plaintiffs have requested that the Court appoint a receiver to take control over the assets of CCEX and for an accounting by CCEX and defendant Wallin of all funds received from investors who purchased coins.

It is the opinion of the Court that at the present time it does not have enough information upon which to make such a ruling. Therefore, the plaintiffs are di-

rected to schedule a hearing whereupon the merits of such relief will be considered.

Based on the foregoing conclusions, it is ordered, adjudged and decreed that:

I. The plaintiffs motion to amend their complaint is hereby granted.

II. The plaintiffs motion for summary judgment as to liability on Count II of their first amended complaint is hereby granted.

III. The defendants motion for summary judgment is hereby denied.

IV. The plaintiffs are ordered to schedule a hearing whereupon the Court will consider the merits of appointing a receiver to take control over the assets of CCEX and for an accounting by defendant CCEX and defendant Wallin of all funds received from investors who purchased coins.

It is so ordered.